Judge Hitchcock
delivered the opinion of the court:
The material facts of this case are as follows:
1. On March 24, 1830, Henry Wells mortgaged to E. Buckingham, ji\ & Co., four hundred and ninety-six acres of land, part of *138 section 2, township 2, range 1.0, in Licking county, to secure the payment of a promissory note of even date, in three months, for five hundred and twenty dollars seventy-eight cents. This mortgage.was recorded on August 31, 1830, and remains unpaid and unsatisfied; two hundred and ninety-six acres of the tract thus mortgaged *had been previously sold and conveyed by the mortgagor, and, of course, is not now in controversy.
2. At the October term, 1830, of the court of common pleas of Liclking county, Taylor recovered a judgment against Henry Wells, for the sum of four thousand dollars, the penalty of the bond upon which the suit was brought, subject to an inquiry as to the amount due in equity. At the October term, 1831, on inquiry, execution was awarded for twelve hundred and six dollars and fourteen cents, the sum then due in equity ; and on April 25, 1832, an execution issued, which, on the 29th day of the same month, was levied on lots Nos. 1, 2, 3, 32, 38, and 39, in the town Of Licking, which town is situate on the two hundred acres covered by the mortgage from Wells to Buckingham & Oo. The same execution was at the same time levied on thirty acres of land, west end of said two hundred acres. This levy remains undisposed of.
At the March term, 1833, of the same court, furtner breaches having been assigned by scire facias, a further execution 'was awarded for six hundred and forty-five dollars and eighty-seven cents, the sum then due in equity; and on the 25th day of April following, an execution was issued upon this award, and was levied on twenty-four lots in said town of Licking. Pursuant to this levy, said lots were sold on March 29, 1834, for two hundred and seventy-eight dollars and thirty-one cents, of which thirty-eight dollars and thirty-one cents was applied to the costs, and two hundred and forty dollars to the debt of the execution
3. On January 13, 1831, Wells executed to Smith & Towner a mortgage on the same two hundred acres, covered by the previous mortgage of Buckingham & Co., excepting the town of Licking above named. This mortgage was to secure the payment of four several promissory notes, of even date, amounting together to sixteen hundred and seventy-one dollars.
At the October term, 1831, of the court of common pleas of Licking county, Towner recovered against Wells a judgment, on two of the notes secured by said mortgage, for the sum of seven *139 hundred and forty-one dollars and twenty-one cents; and at the March term, 1832, he recovered a further judgment, on one other of said notes, for three hundred and forty-four dollars and thirty-one cents. On the 23d of March, executions issued on both these judgments, and on the 29th of April following, were levied on ninety-six acres of land, east end of said two hundred acres, covered by the mortgages of Buckingham & Co., and of Towner. This land, however, has not been sold, although the levy has been kept good.
At the June term, of the same court, 1832, Towner recovered a further judgment, on the remaining note, for three hundred and forty-eight dollars; and *on April 25, 1833, an execution was issued on this judgment. This execution was levied on June 29, 1833, on seventy acres, west end of said two hundred acres, excluding the town of Licking, and the ninety-six acres before levied upon by Towner, but including the thirty acres previously levied upon by Taylor.
4. At the October term, 1832, on a bill to foreclose his mortgage (to which, neither Taylor nor Buckingham & Co. were parties), Towner obtained a decree for the sale of the two hundred acres covered by his mortgage, pursuant to which decree, the sale was afterward made to himself for eighteen hundred and one dollars and fifty cents, but this sale has never been confirmed by the court.
5. In 1833, William Taylor purchased in the mortgage, of E. Buckingham, jr. & Co., and took an assignment of it.
After the original bill of Towner was filed, he assigned his interest to Avery and P. W. Taylor, who have instituted -a supplemental bill, setting forth the assignment to them, and alleging that they have offered to redeem the Buckingham mortgage from William Taylor, which he refused to permit them to do, claiming the right to tack Ms judgment to this mortgage, and thereby to secure himself.
There are other facts in the case, but these are all that is material to state. There are also other judgment creditors, but it is unnecessary to go into an examination of their liens, as such examination can not, in any shape, affect the main point decided.
It is insisted by William Taylor, in his cross-bill, that he is entitled, as assignee of Buckingham & Co., to 'tack his judgment to their mortgage, and thus exclude the intervening mortgage and *140 judgment of Towner. This point, however, is not insisted upon by his counsel; and, with their usual candor, they admit the authorities are against them. This principle of tacking, it is believed, was never recognized in this state, and so long as regard is paid to natural justice, I apprehend it never will be. Ocr statutes have prescribed for us rules, with respect to the priority of liens, and by them we must be governed.
There is no controversy but that the mortgage to E. Buckingham, jr. & Co. is the elder and better lien upon the land in controversy, and must be first satisfied. It was executed March 24, 1830, and is now the property of William Taylor.
The mortgage to Towner was executed in January, 1831, and must be next satisfied, unless postponed to the judgment recovered by William Taylor in October of the preceding year. It is necessary, then, to ascertain the character of this judgment, and ^settle the question, whether it operated as a lien from the time of its rendition, or only from the time of the several executions awarded. This is the principal question argued by counsel, and when disposed of, there does not seem to be any further difficulty in the case. If this judgment was a lien from the time of its rendition, although no execution was sued out, within the year after it was rendered, and therefore could not operate to the pre-judice of subsequent bona fide judgment creditors, still it would operate to the prejudice of subsequent purchasers.
This judgment is upon a bond for the performance of collateral conditions, and is for the penalty of four thousand dollars. It was not a judgment, however, upon which execution could issue, but was rendered subject to a subsequent inquiry as to the amount dtae in equity. This inquiry was had in October, 1831, and an execution awarded for one thousand two hundred and six dollars and fourteen cents. Whether this sum was actually due, or whether anything was due, in October, 1830, does not appear, but this much was in equity due in 1831. The proceeding was under the practice act of February 18, 1834, which authorized the court, where suit was brought “ upon any bond, or other contract in writing, for the recovery of any forfeiture or penalty, or for the non-performance of any contract, or other agreement, contained in such bond, or other contract in writing,” etc., to give judgment for the penalty of the bond, and to award execution for the amount of damages assessed by a jury, or for the sum due in equity, ac *141 cording to the nature of the case, together with costs of suit. ’ And. it was further provided, that the judgment for the penalty should stand “ as security ” for any further breaches that might subsequently happen of “ such covenants, agreements, or conditions,’ etc. 2 Chase’s Stat. 1268. It seems to be supposed, that as this judgment for the penalty of the bond is to remain as “ a security ” for any further breaches, etc., therefore that it must operate as a lien. I do not so understand it. The only effect of the whole provision is, to empower a person, who is the obligee of a penal bond, for the performance of collateral conditions, to commence his action when only a part of the conditions shall have been broken, and have execution so far as he has sustained injury. But if afterward he sustains further injury by the breach of other conditions of the contract, he may have further execution and satisfaction.
A judgment, of itself, does not confer any rights upon the creditor over the estate of the debtor. It is not, ex vi termini, any lien upon his estate ; it is evidence of a right which may be *enfofced by execution; but the right itself existed previously. Whether it shall operate as a lien, and to what extent, is the proper subject of legislative enactment.
The act of February 4, 1824, “regulating judgments and executions,” 3 Chase’s Stat. 129, was in force when this judgment for four thousand dollars was rendered. In section 2, it is enacted, “that the lands and tenements of the debtor shall be-bound for the satisfaction of any judgment against such debtor, from the first day of the term at which judgment, shall be rendered, in all cases where such lands lie in the county where the judgment is entered; and all other lands, as well as the goods and chattels, of the debtor, shall be bound from the time they are seized in execution.” The term, “ any judgment," is broad and comprehensive, and would include judgments of any and every description. Could this have been the intention of the legislature? It seems to me that an examination of the statute will show that it could not. Judgments are either interlocutory, or final, and either would be embraced in the words “ any judgment." Still, generally speaking, upon an interlocutory judgment, an execution can not be issued. But in section 17, it is provided that no judgment “ on which execution shall not have been taken out, and levied before the expiration of one year next after the rendition of such judgment, shall operate as a lien on the estáte of any debtor, to the prejudice of any other *142 bona fide judgment creditor.” Now, it can hardly he supposed that the legislature intended to deprive a man of his lien, when it was not in his power to enforce it. In truth, the contrary is manifested by this same section, whore it is provided, that when the judgment is rendered in the Supreme Court, the year shall commence to run from the first day of the term of the court of common pleas to which the mandate for execution from the Supreme Courtis directed. And, it is further expressly enacted, that “ nothing in this section contained, shall be so construed as to defeat the lien of any judgment creditor, who shall fail to take out execution, and cause a levy to be made as herein provided, when such failure shall be occasioned by appeal, writ of error, injunction, or by a vacancy in the office of sheriff, or coroner, or the inability of such officer, until one year after such disability shall be removed.”
From a review of the whole statute, and more particularly of section 17, I am led to the conclusion that the legislature, when they speak, in the second section, of “ any judgment,” ^intend any judgment which is final, and conclusive of the matters in controversy between the parties — of judgments, in pursuance of which the creditor may forthwith have execution.
What, then, is the character of the judgment recovered by William Taylor at the October term of the court of common pleas? Was it a final judgment? “Final judgments are such as at once put an end to the action.” 3 Bl. Com. 398. This is not such a judgment. It did not put an end to the action. Further proceedings were necessary to be had before the rights of the parties could be ascertained, or before execution could be issued. It may properly be assimilated to a judgment, by default or on demurrer, where a subsequent inquiry of damages is necessary. Such judgments are merely interlocutory, and can not operate as liens upon the lands and tenements of a defendant. If we were to hold otherwise, it would follow that this judgment lost its lien before execution could be had upon it, because no execution was awarded until one year after judgment rendered.
In the opinion of the court, this judgment did not operate as a lien until execution was awarded, in October, 1831, and then only to the extont of the amount for which execution was so awarded. Previous to this period, the mortgage was executed to Towner, and constitutes a preferable lien.
*143 Such being the opinion of the court, it is unnecessary to examine the other points made in the case, as to the effect of Towner’s judgments, the executions upon those judgments having been levied upon the same lands covered by his mortgage.
A decree may be taken referring the case to a master, and directing the sale of the lands mortgaged, excepting those lots in the town of Licking, which have already been disposed of. In distributing the avails, the Buckingham mortgage must first be satisfied; next the mortgage to Towner; and the balance, if any, will be distributed among the several judgment creditors, according to their respective liens.